UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

OCEAN PARTNERS, LLC and BATTERY            :
COMMERCIAL ASSOCIATES, LLC,
                                           :

              Plaintiffs,                :            04 Civ. 00470 (BSJ) (GWG)

                                           :

        -v.-                              :            **REPORT AND**

                                           :            **RECOMMENDATION**

NORTH RIVER INSURANCE COMPANY,

                                           :

            Defendant.
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs Ocean Partners, LLC and Battery Commercial Associates, LLC (collectively,

"Ocean Partners") have brought suit against their insurer, North River Insurance Company

("North River"), to recover insurance proceeds for damages sustained to their building during the

September 11, 2001, attack on the World Trade Center ("WTC"). North River now seeks

summary judgment alleging that the loss is not covered by its insurance policy based on two

exclusions. For the reasons stated below, North River's motion for summary judgment should

be denied.

I.      BACKGROUND

      A.     The Policy

      Ocean Partners owns 17 Battery Place ("the Building"), a commercial and residential

building in lower Manhattan.[1] See Defendant's Statement of Material Facts, dated Apr. 17, 2006

(annexed to Defendant's Motion for Summary Judgment, filed April 17, 2006 (Docket # 48)

---

     [1] Ocean Partners, LLC owns floors 14 to 31 and Battery Commercial Associates, LLC owns floors 1 through 13. See Amended Complaint, dated Feb. 25, 2005 (reproduced as Ex. B to Declaration of Lisa Wall in Opposition to Defendant's Motion for Summary Judgment, filed May 17, 2006 (Docket # 51) ("Wall Decl.")), ¶¶ 1-2 .

("Motion")) ("Def. 56.1"), ¶ 1.  In January 2001, North River issued a first-party property

insurance policy (the "Policy") to Ocean Partners covering the period January 26, 2001 to

January 26, 2002.  Id.; see Policy (reproduced as Ex. E to Declaration of Kirk M. Zapp in

Support of Defendant's Motion for Summary Judgment (attached to Motion) ("Zapp Decl."))

("Policy"), at *2.[2]  The Policy provides coverage for "direct physical loss of or damage to

Covered Property . . . caused by or resulting from any Covered Cause of Loss."  Policy at *33.

The policy states that "Covered Causes of Loss means RISK OF DIRECT PHYSICAL LOSS

unless the loss is" excluded or limited by the Policy.  Id. at *35 (capitalization in original).

In a section labeled "Exclusions," the Policy provides

> 2.      We will not pay for loss or damage caused by or resulting from any of the
> following:
>
> *      *      *      *
>
> i.      Collapse, except as provided in the Additional Coverage
>         for Collapse.  But if collapse results in a Covered Cause of
>         Loss at the described premises, we will pay for the loss or
>         damage caused by that Covered Cause of Loss.
>
> j.      Discharge, dispersal[,] seepage, migration, release or
>         escape of 'pollutants' unless the discharge, dispersal,
>         seepage, migration, release or escape is itself caused by any
>         of the 'specified causes of loss.'[³]

Id. at *47-48 (alterations added).  The policy defines "pollutants" as "any solid, liquid, gaseous

or thermal irritant or contaminant, including smoke, vapor, soot[,] fumes, acids, alkalis,

---

[2] Asterisked page numbers refer to the page numbers listed at the bottom of each page of
North River's compilation of documents, not to the Policy's original page numbers.

[3] The Policy defines "specified causes of loss" as "Fire; lightning; explosion; windstorm
or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire
extinguishing equipment; sinkhole collapse; volcanic action; failing [sic] objects; weight of
snow, ice, or sleet; water damage; mechanical, electrical or pressure system breakdown."  Policy
at *63.

chemicals and waste." Id. at *63 (alteration added).

       B.      The Damages Sustained on September 11, 2001

      The Building is located near the WTC. On September 11, 2001,

> [t]wo commercial airliners were hijacked, and each was flown into one of the two 110-story towers. The structural damage sustained by each tower from the impact, combined with the ensuing fires, resulted in the total collapse of each building. As the towers collapsed, massive debris clouds consisting of crushed and broken building components fell onto and blew into surrounding structures.

Executive Summary, World Trade Center Building Performance Study, undated (annexed as Ex. G to Wall Decl.), at 1.[4] Ocean Partners has provided an expert report, which we accept as true for purposes of this motion, reflecting that "more than 1.2 million tons of building materials were pulverised during the WTC Event, primarily from insulation and from fireproofing." Assessment 17 Battery Place/1 West Street Property, dated Dec. 2004 (annexed as Ex. H to Wall Decl.) ("Lee Report"), at 2061. The materials generated from the collapse of the towers, referred to as "WTC Particulate," include asbestos, lead, and mercury. Id. The report goes on to state that,

> WTC Particulate possesses a unique set of characteristics by which it can be identified and differentiated, to a reasonable degree of scientific certainty, from particulate in non-impacted buildings. The WTC Particulate contains chemical and morphological characteristics that are distinct from 'typical, everyday' dust found in non-impacted buildings.

Id.

     The report reflects that "the Building was impacted by WTC Particulate and WTC

---

    [4] While defendants are contesting the arguments made by Ocean Partners as to the significance of the facts described in the above-quoted paragraph, the Court does not understand defendants to be contesting these facts themselves. In any event, as will be clear in the next section, the sequence of events prior to the collapse of the WTC towers is not determinative of the instant motion.

Hazardous Substances" emanating from the WTC towers.  Lee Report at 2060.  A "pressure differential [was] caused by the onrush of the WTC Particulate cloud that was created by the collapse of the WTC Towers."  Id.  "The pressure differential . . . forced large quantities of particulate laden air to move through pathways, including but not limited to HVAC [heating, ventilation and airconditioning] and mechanical and electrical systems.  The WTC Particulate infiltrated the Building, including the HVAC systems (ductwork, air handlers, chillers) elevators (cables, cabs, and controls) and electrical systems."  Id.

In addition to damaging mechanical systems, maintenance costs have increased and various components of the Building have been so extensively damaged that "[i]t is likely to be physically and economically unfeasible to remediate building systems and components sufficiently to assure long-term reliability of the equipment."  Id. at 2058.  The expert concludes that the "WTC Particulate must be removed to eliminate the risk to human health."  Id. at 2059.  Other experts have offered additional evidence as to damage caused by dust generated from the WTC collapse, such as damage to elevator, fire safety and HVAC systems.  See Letter from Melvin B. Singer to A.J. Contracting, dated March 13, 2002 (annexed as Ex. A to Supplemental Declaration of Kirk M. Zapp in Support of Defendant's Motion, filed Feb. 2, 2007 (Docket # 59) ("Suppl. Zapp Decl.")).

After Ocean Partners submitted a claim to North River for its property damage, North River determined that Ocean Partners suffered "some compensable loss," for which North River paid $3,104,849.48.  See Defendant's Answer to Second Amended Complaint and Counterclaim (reproduced as Ex. D to Zapp Decl.), ¶¶ 11, 28.  North River declined to make any further payments, however.  Id. ¶ 29.  In January 2004, Ocean Partners filed a suit in New York State

Supreme Court seeking additional payments under the Policy.  See Complaint (annexed as Ex. A

to Zapp Decl.).  On January 21, 2004, North River removed the suit to this Court.  See Notice of

Removal, filed Jan. 21, 2004 (Docket # 1).

        C.      The Current Motion

      In April 2006, following discovery, North River moved for summary judgment on the

ground that Ocean Partner's claim is barred by two exclusions in the Policy.[5]  In December

2006, the Second Circuit issued an opinion in Parks Real Estate Purchasing Group v. St. Paul

Fire and Marine Ins. Co., 472 F.3d 33 (2d Cir. 2006), vacating a lower court decision on which

defendant's moving papers had heavily relied.  Accordingly, the Court issued an Order directing

the parties to "address[] the effect (if any) of the Second Circuit's decision in the Parks Real

Estate case on defendant's motion."  Order, filed Jan. 8, 2007 (Docket # 56).  In response, the

parties submitted additional briefing on the motion.[6]

---

[5] The initial papers on the motion were as follows: Motion; Defendant's Memorandum of
Law in Support of Defendant's Motion for Summary Judgment (attached to Motion) ("D.
Mem."); Def. 56.1;  Zapp Decl.; Plaintiffs' Memorandum of Law in Opposition to Defendant's
Motion for Summary Judgment, filed May 17, 2006 (Docket # 50) ("P. Mem."); Wall Decl.;
Plaintiffs' Statement of Material Facts as to Which There Exists Genuine Issues to Be Tried,
dated May 17, 2006 (attached to Wall Decl.); Response to Plaintiffs' Statement of Material Facts
as to Which There Exists Genuine Issues to Be Tried, filed May 31, 2006 (Docket # 53);
Defendant's Memorandum of Law in Reply to Plaintiffs' Opposition to Defendant's Motion for
Summary Judgment, filed May 31, 2006 (Docket # 54) ("D. Reply Mem.").

[6] See Defendant's Supplemental Memorandum of Law in Support of Defendant's Motion
for Summary Judgment, filed Feb. 2, 2007 (Docket # 57) ("D. Suppl. Mem."); Suppl. Zapp
Decl.; Defendant's Supplemental Statement of Material Facts, filed Feb. 2, 2007 (Docket # 58);
Plaintiffs' Response to Defendant's Supplemental Statement of Material Facts, filed Feb. 16,
2007 (Docket # 60); Declaration of Joshua L. Mallin in Opposition to Defendant's Motion for
Summary Judgment, filed Feb. 16, 2007 (Docket #61); Defendant's Supplemental Reply
Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed Feb. 23,
2007 (Docket # 63); Supplemental Memorandum of Law of Plaintiffs Ocean Partners, LLC and
Battery Commercial Associates, LLC in Opposition to Defendant North River Insurance

II.    APPLICABLE LEGAL STANDARDS

    A.    The Law Governing Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus, should be left to the finder of fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed," and the court must draw "all justifiable inferences" in favor of the nonmovant.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted), and "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Generally, where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'"  Nebraska v.

---

Company's Motion for Summary Judgment, filed Apr. 16, 2007 (Docket # 64).

Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)) (alteration in original).

"The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002). However, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005) (citation and internal quotation marks omitted). Whether a contractual provision is ambiguous is a "threshold question of law to be determined by the court." Parks Real Estate, 472 F.3d at 42 (citing cases). If a court determines that a contractual provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Id. 472 F.3d at 43 (citation and internal quotation marks omitted).

B.     Law Governing Interpretation of Insurance Policies

1.     Determining the Scope of An Exclusion

New York courts interpret insurance contracts "to give effect to the intent of the parties as expressed in the clear language of the contract." Goldberger v. Paul Revere Life Ins. Co., 165 F.3d 180, 182 (2d Cir. 1999).[7] Generally, the terms of insurance policies are read "in light of

---

[7] While neither party explicitly discusses choice of law, defendants assert that New York insurance law is "controlling," see D. Reply Mem. at 1 – a proposition plaintiffs did dispute in thier later briefing. In these circumstances, the parties have implicitly consented to having New York law apply, and this "'implied consent . . . is sufficient to establish choice of law'" on the question. Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

common speech and the reasonable expectations of a businessperson." Parks Real Estate, 472 F.3d at 42 (citing Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 13 A.D.3d 599, 599-600 (2d Dep't 2004); Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y., 241 A.D.2d 66, 68-69 (1st Dep't 1998)). However, with regard to exclusion provisions, courts are more exacting. Where an insured seeks to challenge an exclusion, the insurer must satisfy a "heavy burden" before coverage will be denied. Belt Painting Corp. v. TIG Ins. Co., 100 N.Y.2d 377, 384 (2003). The insurer "'must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon.'" Parks Real Estate, 472 F.3d at 42 (quoting Throgs Neck Bagels, 241 A.D.2d at 71) (alteration in original). The terms of an exclusion should be "'accorded a strict and narrow construction'" and "'are not to be extended by interpretation or implication.'" Parks Real Estate, 472 F.3d at 43 (quoting Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 311 (1984)).

### 2. Whether a Term is Ambiguous

In New York, "'[a]n ambiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Parks Real Estate, 472 F.3d at 42 (quoting Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000)) (internal quotation marks omitted). However, the "'[t]he fact . . . that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the

purview of such terms.'" <u>Morgan Stanley Group</u>, 225 F.3d at 276 (quoting 2 Lee R. Russ &

Thomas F. Segalla, <u>Couch on Insurance</u> 3d § 21:14 (1997)); <u>see</u> <u>also</u> <u>Stoney Run Co. v.</u>

<u>Prudential-LMI Commercial Ins. Co.</u>, 47 F.3d 34, 37 (2d Cir. 1995) ("An exclusionary clause . . .

can be ambiguous in one context and not another." (citing <u>Cont'l Cas. Co. v. Rapid-Am. Corp.</u>,

80 N.Y.2d 640, 652 (1993))).  Also, "[i]n assessing ambiguity, we consider the entire contract to

'safeguard against adopting an interpretation that would render any individual provision

superfluous.'" <u>RJE Corp. v. Northville Indus. Corp.</u>, 329 F.3d 310, 314 (2d Cir. 2003) (quoting

<u>Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1095 (2d Cir.

1993)).

     "If the court concludes that an insurance policy is ambiguous, then the burden shifts to

the insurer to prove that its interpretation is correct . . . ." <u>Parks Real Estate</u>, 472 F.3d at 43.

Where "extrinsic evidence is available but inconclusive, the burden shifts [to the insurer] at the

trial stage[,] . . . . [but] in the absence of extrinsic evidence, the burden shifts [to the insurer] at

the summary judgment stage." <u>Id.</u> (quotation marks and citation omitted) (some alterations

added).  And "[i]f the extrinsic evidence does not yield a conclusive answer as to the parties'

intent, a court may apply other rules of contract construction, including the rule of <u>contra</u>

<u>proferentem</u>, which generally provides that where an insurer drafts a policy any ambiguity in

[the] . . . policy should be resolved in favor of the insured." <u>Id.</u> (citation and internal quotation

marks omitted) (alteration in original).

III.    <u>DISCUSSION</u>

     In its motion for summary judgment, defendant argues that two exclusions in the Policy,

relating to "pollutants" and "collapse," bar coverage in this case.  Motion ¶ 2; D. Mem. at 1.  We

discuss each in turn.[8]

A.    The Pollution Exclusion

North River argues that the damage at issue was – to use the language of the Policy – "damage caused by or resulting from . . . dispersal . . . of 'pollutants.'" Policy at *47-48.  Under the Policy, "'pollutants' means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot[,] fumes, acids, alkalis, chemicals and waste." Id. at *63 (alteration added).  Perhaps because it could not seriously contend that the cloud of WTC particulate was a "pollutant" as that term is normally understood, North River homes in on the word "contaminant" in this definition.  It points out that the Ocean Partners' own experts repeatedly use the word "contaminate" and "contaminant" to describe damage that was done to 17 Battery Place.  D. Mem. at 5-7.  It concludes, therefore, that the pollution exclusion bars Ocean Partners' claim.  Id. at 10.

The issue here, of course, is not whether the damage done to the building could be described as involving "contaminants" but rather whether what occurred at the Building is within the pollution exclusion of the Policy.  As it turns out, we do not write on a clean slate on this

---

[8]    North River's notice of motion and initial brief raised only the pollution and collapse exclusions as bars to coverage.  See Motion ¶ 2 ("The Policy's 'pollution' and 'collapse' exclusions bar Plaintiffs' claims for damage.");  accord D. Mem. at 1.  In its reply brief, North River for the first time discussed the question of whether an exclusion for "corrosion" bars the claims in this case.  D. Reply Mem. at 17-18.  Because it was not timely raised, we decline to address this argument.  See, e.g., Fisher v. Kanas, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (argument raised for the first time in reply brief was waived) (citing cases); Estate of Ungar v. Palestinian Auth., 451 F. Supp. 2d 607, 611 (S.D.N.Y. 2006) ("as a general rule, courts will not consider arguments raised for the first time in a reply brief"); cf. ABN Amro Verzekeringen BV v. Geologistics Ams., Inc., 485 F.3d 85, 97 n.12 (2d Cir. 2007) (declining to consider argument raised for the first time in a reply brief).

point.  The term "contamination" was also contained in the policy at issue in the recently-decided Parks Real Estate case, in which Second Circuit dealt at length with the meaning of this term and whether it should be deemed ambiguous in the context of infiltration by WTC particulate.  Notably, Ocean Partners has obtained a report from the same expert used by the plaintiffs in Parks Real Estate, and large portions of the reports produced in each case are identical.  Compare 472 F.3d at 38-39, with Lee Report at 2058-59.  Thus, the evidence as to damage to the insured buildings and the cause of that damage is identical in both cases.

In addition, the texts of the policies at issue in both cases are similar in important respects.  The Policy here – as elided in the way defendants argue – excludes "damage caused by or resulting from . . . dispersal . . . of . . . contaminant[s]."  Policy at *47-48, 63.  In Parks Real Estate, the Policy excluded "damage caused by or made worse by any kind of contamination of . . . property."  472 F.3d at 37.  Indeed, if anything the policy in Parks Real Estate broadened the reach of the word "contamination" by referring to "any kind of" contamination.  Id.

Noting the requirements of New York law that an insurer has the burden of showing that the exclusion is stated in "clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon," 472 F.3d at 42 (citation and internal quotation marks omitted), Parks Real Estate found that the term "contamination" was ambiguous.  Id. at 45.  This conclusion is in line with many other cases that have found ambiguity in "pollution" clauses when applied to non-environmental pollution.  See, e.g., Herald Square Loft Corp. v. Merrimack Mut. Fire Ins. Co., 344 F. Supp. 2d 915, 921 (S.D.N.Y. 2004); Belt Painting Corp., 100 N.Y.2d at 382.

Parks Real Estate reached this conclusion by first contrasting two types of cases dealing with pollution or contamination exclusions: those that look purely at the definition of "contamination" or "contaminant" in isolation, and those cases that adopt a "contextual" approach. 472 F.3d at 44. The Court identified Enron Oil Trading & Transp. Co v. Walbrook Ins. Co., 132 F.3d 526 (9th Cir. 1997), as a case that adopted the "contextual definition" of contamination, Parks Real Estate, 472 F.3d at 44, and stated that it agreed with this approach. Id. In Enron Oil, the policy excluded coverage for damage caused by "pollution or contamination." 132 F.3d at 529-30. A separate clause that followed made clear that the policy did not cover the cost of "removing, nullifying or cleaning-up seeping polluting or contaminating substances." Id. at 530. While noting that applicable state law would have viewed the terms "pollution or contamination" as including the sort of damage involved in that case, the Ninth Circuit concluded that the terms had to be construed in light of the separate clause. Id. It found that with the inclusion of this clause, the policy sent "an unmistakable message to the reasonable reader that the exclusion deals with environmental-type harms." Id. Accordingly, it found that the damage at issue was not excluded by the policy.

Parks Real Estate next examined Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037 (7th Cir. 1992), in which the Seventh Circuit considered a policy that excluded coverage for damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants." Id. at 1043. This clause was followed, however, by a clause that limited the pollutants excluded to those "at or from any site or location used by or for the named insured or others for the handling, storage, disposal, processing or treatment of waste." Id. The Court found that because the pollution in that case arose from the handling and

storage of waste – specifically, the disposal of waste by a scrap metal processor – the pollution exclusion applied.  Id. at 1043-44.  Parks Real Estate cited favorably language in Pipefitters noting that "'[w]ithout some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results.'"  Parks Real Estate, 472 F.3d at 45 (quoting Pipefitters, 976 F.2d at 1043).  Giving two "'simple examples'" – bodily injuries caused by Drano or chlorine in a pool – the court noted that "'[a]lthough Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.'"  Parks Real Estate, 472 F.3d at 45 (quoting Pipefitters, 976 F.2d at 1043).

The remaining case discussed by Parks Real Estate, McConnell Constr. Co. v. Ins. Co. of St. Louis, 428 S.W.2d 659 (Tex. 1968), involved a policy that excluded "[l]oss by contamination including such loss by any radioactive or fissionable materials."  Id. at 659.  McConnell found that damage resulting from the creation of fumes and gases that followed application of acid to a brick floor did not constitute "contamination."  Parks Real Estate, 472 F.3d at 45.  Parks Real Estate discussed McConnell to illustrate "how the term 'contamination' may be used improperly as a synonym for various types of damage and chemical processes, which may or not properly be classified as contamination or excluded from coverage under the terms of a policy."  Parks Real Estate, 472 F.3d at 45.

The Parks Real Estate case itself did not involve a policy such as the ones in Enron Oil and Pipefitters – that is, policies where the pollution or contamination exclusion was followed by a clause that provided some context to what was meant by the exclusion.  Rather, the Parks Real Estate pollution exclusion – more in line with the McConnell case – read simply that the policy

excluded "damage caused by or made worse by any kind of contamination of . . . property."  472 F.3d at 37.  Similarly, the  "pollution" exclusion in the instant case excludes coverage for dispersal of "pollutants" without any clauses giving context to the sort of pollution intended.[9] All that is provided is a definition of "pollutants" that contains the term "contaminant[]" – specifically: "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot[,] fumes, acids, alkalis, chemicals and waste."  Policy at *63 (alterations added).

In Parks Real Estate, the Court found that the term "contamination" was ambiguous in the context of the policy at issue in that case.  472 F.3d at 45.  The reason it founds such ambiguity was that

> the common definition of the term that the District Court employed – the "introduction of a foreign substance that injures the usefulness of the object" or "a condition of impurity resulting from the mixture or contact with a foreign substance" – would allow the contamination exclusion in the Policy to be applied in a limitless variety of situations.

Id.  Parks Real Estate gives the example of the WTC collapsing directly on top of the subject property.  Id.  It could not be the case, it noted, that the policy was intended to exclude the ensuing damage on the ground that the damage resulted from "the introduction of a foreign substance," or "a condition resulting from the mixture or contact with a foreign substance."  Id. (citation and internal quotation marks omitted).  The Court also cited favorably New York case law suggesting that a pollution exclusion should not be read literally but rather by keeping in mind "the general purpose of pollution exclusions, which is to exclude coverage for

---

[9] The only limitation is the statement that the pollution exclusion will not apply if the "the discharge, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss,'" Policy at *48, such as fire, lightning, explosions and a number of other causes. Id. at *63.  This clause, however, does not shed further light as to the meaning of the word "pollutant."

environmental pollution." Id. at 47 (citing Pepsico, 13 A.D.3d at 600). Another case cited,

Nautilus Ins. Co. v. Jabar, 188 F.3d 27 (1st Cir. 1999), contained a definition of "pollutant"

substantively identical to the one at issue in the Policy here: "any solid, liquid, gaseous, or

thermal irritant and contaminant." Id. at 30. Nautilus found this exclusion to be ambiguous.

Parks Real Estate concluded its discussion of the contamination exclusion as follows:

> Without doubt, there are many situations where an insured's property is rendered
> "impure" or is damaged by "the introduction of a foreign substance." Under an
> all-risk policy, almost any unintended damage to a building or its contents could
> be considered contamination within these broad definitions of the term. Under
> such a construction, the all-risk policy would insure against virtually nothing.
> Accordingly, we find that the term "contamination" is ambiguous in the context
> of the all-risk Policy that we are considering. The District Court concluded
> "[w]hether the airborne substance at issue is considered pulverized, abrasive,
> corrosive, erosive, particulate or contaminant, the effect on the Property was
> contamination." Parks Real Estate, 2005 WL 2414771, at *4. We are not so sure
> that the damage caused by the settling of the airborne matter into Parks' Building,
> machinery, and equipment was intended by the parties to constitute contamination
> excluded from the Policy's coverage. Because of the "virtually boundless" array
> of possible applications of the term contamination in the contamination exclusion
> provision, we think that the parties should be allowed to introduce evidence of
> what was intended by the use of this ambiguous term. See Morgan Stanley Group
> Inc., 225 F.3d at 275-76. Opting for the contextual approach, we think that
> questions of material fact pertaining to the meaning of the term contamination
> under this all-risk Policy remain for resolution by the trier of fact

472 F.3d at 48.

There is no basis on which to distinguish the exclusion in Parks Real Estate from the

exclusion here. Just as was true in Parks Real Estate, there are many situations that fit the

dictionary definition of "contamination" (or "contaminant") cited in that case. Because of the

boundless array of possible applications of these terms, it is not clear that the Policy was

intended to exclude them. Thus, North River has not met its burden of showing that the

pollutant exclusion "is stated in clear and unmistakable language, is subject to no other

reasonable interpretation, and applied in the particular case and that its interpretation of the exclusion is the only construction that [could] fairly be placed thereon." Parks Real Estate, 472 F.3d at 42 (citation and internal quotation marks omitted). Accordingly, the resolution of the exclusion's meaning must be made by the trier of fact.

The argument on which North River most heavily relies to distinguish Parks Real Estate is the fact that Ocean Partners experts state repeatedly that the Building is rife with "contamination" and "contaminants." D. Suppl. Mem. at 5-11; see also D. Mem. at 6-8. North River thus argues that in Parks Real Estate there was "minimal evidence of contamination," D. Suppl. Mem. at 6, whereas here Ocean Partners and its experts "overwhelmingly admit" that "WTC Particulate is a contaminant." D. Suppl. Mem. at 6. The use of these words by plaintiffs or their experts, however, is entirely consistent with the Parks Real Estate ruling. The problem with the word "contaminant" is not that it has no commonly-used meaning, but that in the context of the Policy its meaning is so "broad," Parks Real Estate, 472 F.3d at 48, as to be ambiguous. Notably, as North River has pointed out, see D. Mem. at 2, the expert report in Parks Real Estate is virtually identical to the main report proffered by plaintiffs here, and thus the repeated use of the terms "contaminants" and "contamination" was assuredly present in the Parks Real Estate case itself. See 472 F.3d at 39 (quoting expert report's reference to "contaminated moving parts").

B.    Collapse Exclusion

The applicability of the collapse exclusion turns on whether the damage to the Building was "caused by" collapse within the meaning of the policy. Policy at *48. Parks Real Estate addressed the law that governs the question of causation in an insurance policy exclusion as

follows:

> "The efficient proximate cause of a loss is the cause that originally sets other events in motion." <u>Kula v. State Farm Fire & Cas. Co.</u>, 212 A.D.2d 16, 628 N.Y.S.2d 988, 991 (N.Y. App. Div. 1995). A court must not, however, examine or identify "the event that merely set[s] the stage for [a] later event." <u>Kosich v. Metro. Prop. & Cas. Ins. Co.</u>, 214 A.D.2d 992, 626 N.Y.S.2d 618, 618 (N.Y. App. Div. 1995) (internal quotation marks omitted). "Only the most direct and obvious [efficient] cause should be looked to for purposes of the exclusionary clause." <u>Kula</u>, 628 N.Y.S.2d at 991. "When the court interprets an insurance policy excluding from coverage any injuries 'caused by' a certain class of conditions, the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." <u>Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.</u>, 19 F.3d 78, 81 (2d Cir.1994) (internal citations and selected quotation marks omitted).

472 F.3d at 48.

In the brief submitted to this Court before the Second Circuit's decision in <u>Parks Real Estate</u>, North River noted that the district court in <u>Parks Real Estate</u> had found that the "contaminants" were the "efficient" cause of the loss and that the collapse of the WTC was the cause not of the loss, but of the contamination. D. Mem. at 9. North River further contended that the <u>Parks Real Estate</u> district court was "clearly correct" as to both these points. <u>Id.</u> But if the district court was correct that "collapse" was not the efficient cause of the loss – in other words, that contamination was – the collapse exclusion does not apply.

Indeed, in its Rule 56.1 statement, North River asserts without qualification that "[t]he 'direct and most obvious' cause of the loss at issue in this litigation is 'contaminants'" – not collapse. Def. 56.1 ¶ 35.

In its initial briefing Ocean Partners tried to locate the cause of damage in events occurring before the collapse, such as the airplane crashes, the explosions and the ensuing fire. <u>See</u> P. Mem. at 17. While <u>Parks Real Estate</u> presumably should be read as rejecting this

argument, it made clear at the same time that the collapse was not the cause of the loss to the property either.  Noting that the district court had found that the collapse was the efficient cause of the particulate cloud – and was thus not the efficient cause of the damage to the building – the Second Circuit agreed that the "efficient cause" of the damage to the insured building was "the actual contact of the airborne particulate matter with the Property."  Parks Real Estate, 472 F.3d at 49.  In other words, Parks Real Estate determined that "the cloud of particulate matter" was the efficient cause of the damage to the property.  Id.  Indeed, defendant concedes – as it must – that the Second Circuit "effectively reject[ed] the causation of loss arguments pinned on collapse."  D. Suppl. Mem. at 4.

Applying this ruling to the instant case, the Court must reject the defendant's argument that the collapse of the WTC was the "efficient cause" of the loss.  Accordingly, defendant is not entitled to a ruling that the collapse exclusion bars coverage.[10]

Conclusion

For the foregoing reasons, North River's motion for summary judgment should be denied.

---

[10] Defendant also argues that it is entitled to summary judgment because Ocean Partners' counter-statement in response to their statement pursuant to Local Civil Rule 56.1 is deficient for failing to respond by numbered paragraphs corresponding to defendant's statement.  D. Suppl. Mem. at 11.  The defendant's statement, however, merely quotes the Policy, the complaint, and plaintiffs' expert reports, and concludes with two legal contentions that should not form part of a Rule 56.1 statement.  Because there is no dispute as to the accuracy of these quotations and because the inclusion of the legal contentions was improper, plaintiffs' failure is of no significance.  In any event, the Court would exercise its discretion not to penalize Ocean Partners for this failure.  See Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

**PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have ten (10) days from service of this Report and Recommendation to

serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any

responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon.

Barbara S. Jones at 500 Pearl Street, New York, New York 10007, and to the undersigned at the

same address. Any request for an extension of time to file objections must be directed to Judge

Jones. If a party fails to file timely objections, that party will not be permitted to raise any

objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140,

144-45 (1985).

DATED: New York, New York
      January 14, 2008

                                     _____
                                     GABRIEL W. GORENSTEIN
                                     United States Magistrate Judge

Copies sent to:

Joshua L. Mallin
Lisa N. Wall
Weg and Meyers P.C.
52 Duane Street
2nd Floor
New York, NY 10007

Kirk M. Zapp
Andrew C. Jacobson
Clausen Miller, P.C.
One Chase Manhattan Plaza
New York, NY  10005

Hon. Barbara S. Jones
United States District Judge
_____

## PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have ten (10) days from service of this Report and Recommendation to

serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any

responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon.

Barbara S. Jones at 500 Pearl Street, New York, New York 10007, and to the undersigned at the

same address. Any request for an extension of time to file objections must be directed to Judge

Jones. If a party fails to file timely objections, that party will not be permitted to raise any

objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140,

144-45 (1985).

DATED: New York, New York
       January 14, 2008

                                    GABRIEL W. GORENSTEIN
                                    United States Magistrate Judge

Copies sent to:

Joshua L. Mallin
Lisa N. Wall
Weg and Meyers P.C.
52 Duane Street
2nd Floor
New York, NY  10007